We'll hear argument this morning in case 12-144, Hollingsworth v. Perry. Mr. Cooper? Thank you, Mr. Chief Justice, and may it please the Court. New York's highest court, in a case similar to this one, remarked that until quite recently, it was an accepted truth for almost everyone who ever lived in any society in which marriage existed. Mr. Cooper, we have jurisdictional and merits issues here. Maybe it would be best if you could begin with the standing issue. I'd be happy to, Mr. Chief Justice. Your Honor, the official proponents of Proposition 8, the initiative, have standing to defend that measure before this Court as representatives of the people and the State of California to defend the validity of the measure that they brought forward. Have we ever granted standing to proponents of ballot initiatives? No, Your Honor. The Court has not done that, but the Court has never had before it a clear expression from a unanimous State's high court. Well, this is the concern, is certainly the proponents are interested in getting it on the ballot and seeing that all the proper procedures are followed. But once it's passed, they have no proprietary interest in it. It's law for them, just as it is for everyone else. So how are they distinguishable from the California citizenry in general? They're distinguishable, Your Honor, because the Constitution of the State of California and its election code provide, according to the unanimous interpretation of the California Supreme Court, that the official proponents, in addition to the other official responsibilities and authorities that they have in the initiative process, that those official proponents also have the authority and the responsibility to defend the validity of that initiative. I guess the Attorney General of the State doesn't have any proprietary interest either, does he? No, Your Honor. But he can defend it, can't he? Because the law says he can defend it. That's right, Your Honor. Nor did the legislative leaders in the Carcher case have any particular enforcement. Could the State assign to any citizen the rights to defend a judgment of this kind? Justice Kagan, that would be a very tough question. It's by no means the question before the Court, because it isn't any citizen. It is the official proponents that have a specific and carefully detailed— Well, I just—if you would, on the hypothetical, could a state just assign to anybody the ability to do this? Your Honor, I think it very well might. It very well might be able to decide that any citizen could step forward and represent the interests of the state and the people. I'm sorry. Are you finished? Yes, Your Honor. Okay. That may be true in terms of who they want to represent, but a state can't authorize anyone to proceed in Federal court, because that would leave the definition under Article III of the Federal Constitution as to who can bring — who has standing to bring claims up to each state. And I don't think we've ever allowed anything like that. But, Your Honor, I guess the point I want to make is that there's no question that the state has standing. The state itself has standing to represent its own interests in the validity of its own enactments. And if the state's public officials decline to do that, it is within the state's authority, surely, I would submit, to identify, if not all, any citizen or at least supporter of the measure, certainly those — that very clear and identifiable group of citizens. Well, the Chief Justice and Justice Kagan have given a proper hypothetical to test your theory. But in this case, the proponents, number one, must give their official address. They must pay money. And they must all act in unison under California law. So these five proponents were required at all times to act in unison. So that distinguishes — and to register and to pay money for the purpose. So in that sense, it's different from simply saying any citizen. But, of course, it is. But can you tell me — that's a factual background with respect to their right to put the ballot initiative on the ballot. But how does it create an injury to them, separate from that of every other taxpayer, to have laws enforced? Your Honor, the question before the Court I would submit is not the injury to the individual proponents. It's the injury to the state. The legislators in the Karcher case had no individual particularized injury. And yet this Court recognized they were proper representatives of the state's interests, the state's injury. At least one of the amici has suggested that it seems counterintuitive to think that the state is going to delegate to people who don't have a fiduciary duty to them. That it's going to delegate the responsibility of representing the state to individuals who have their own views. They proposed the ballot initiative because it was their individual views, not necessarily that of the state. So Justice Scalia proffered the question of the Attorney General. The Attorney General has no personal interest. True. He has a fiduciary obligation. The Attorney General, whether it's a fiduciary obligation or not, is in normal circumstances the representative of the state to defend the validity of the state's enactments when they are challenged in federal court. But when that officer doesn't do so, the state surely has every authority and I would submit the responsibility to identify particularly an initiative. Why isn't the fiduciary duty requirement before the state can designate a representative an important one? Your Honor, I would submit to you that I don't think there's anything in Article III or in any of this Court's decisions that suggests that a representative of a state must have a fiduciary duty. But I would also suggest... Well, generally you don't need to specify it because generally the people who get to enforce the legislation of the government are people who are in government positions, elected by the people. And here those individuals are not elected by the people or appointed by the people. And the California Supreme Court specifically addressed and rejected that specific argument. They said it is in the context when the public officials, the elected officials, the appointed officials, have declined, have declined to defend a statute. A statute that, by the way, excuse me, in this case a constitutional amendment, was brought forward by the initiative process. The Court said it is essential to the integrity, integrity of the initiative process in that state, which is a precious right of every citizen, the initiative process in that state to ensure that when public officials, and after all the initiative process is designed to control those very public officials, to take issues out of their hands, and if public officials could effectively veto an initiative by refusing to appeal it, then the initiative process would be invalid. Historically, I think, 40 states, many states, have what was called a public action. A public action is an action by any citizen primarily to vindicate the interest in seeing that the law is enforced. Yes, now that's the kind of action I think this Court has interpreted in the Constitution of the United States, case in controversy, to say that it does not lie in the federal system. And, of course, if that kind of action is the very kind that does not lie, well, then to say, but they really feel it's important that the law be enforced. They really want to vindicate the process. And these are people of special interest. We found the five citizens who most strongly want to vindicate the interest in the law being enforced and the process for making the law be enforced. Well, that won't distinguish it from a public action. But then you say, but also they're representing the state. At this point, the Dellinger brief, which takes the other side of it, is making a strong argument. Well, they aren't the state. They're really no more than a group of five people who feel really strongly that we should vindicate this public interest and have good reason for thinking it. So you've read all these arguments, you know, they're not really the agents and so forth. What do you want to say about it? What I want to say, Your Honor, is that according to the California Supreme Court, the California Constitution says in terms that among the responsibilities of official proponents, in addition to the many other responsibilities that they step forward and they assume in the initiative process, among those responsibilities and authorities is to defend that initiative if the public officials which the initiative process is designed to control have refused to do it. It might as well say it in those terms, Your Honor. Counsel, if you want to proceed to the merits, you should feel free to do so. Thank you very much, Your Honor. My, excuse me, as I was saying, the accepted truth, excuse me, the accepted truth that the New York High Court observed is one that is changing and changing rapidly in this country as people throughout the country engage in an earnest debate over whether the age-old definition of marriage should be changed to include same-sex couples. The question before this Court is whether the Constitution puts a stop to that ongoing democratic debate and answers this question for all 50 states. And it does so only if the respondents are correct that no rational, thoughtful person of good will could possibly disagree with them in good faith on this agonizingly difficult issue. The issues, the constitutional issues that have been presented to the Court are not of first impression here. In Baker v. Nelson, this Court unanimously dismissed for want of a substantial federal question. Mr. Cooper, Baker v. Nelson was 1971. The Supreme Court hadn't even decided that gender-based classifications get any kind of heightened scrutiny. The same-sex intimate conduct was considered criminal in many states in 1971. So I don't think we can extract much from Baker v. Nelson. Well, Your Honor, certainly I acknowledge the precedental limitations of a summary dismissal. But Baker v. Nelson also came fairly fast on the heels of a loving decision. And, Your Honor, I simply make the observation that it seems implausible, in the extreme, frankly, for nine justices to have seen no substantial federal question if it is true, as the respondents maintain, that the traditional definition of marriage, insofar as it does not include same-sex couples, insofar as it is a gendered definition, is irrational and can only be explained, can only be explained as a result of anti-gay malice and a bare desire to harm. Do you think this can be treated as a gender-based classification? Your Honor, I — It's a difficult question that I've been trying to wrestle with. Yes, Your Honor. And we do not. We do not think it is properly viewed as a gender-based classification. Virtually every appellate court, state and federal, with one exception, Hawaii, in a superseded opinion, has agreed that it is not a gender-based classification. But I guess it is gender-based in the sense that marriage itself is a gendered institution, a gendered term. And so in the same way that fatherhood is gendered or motherhood is gendered, it's gendered in that sense. But we agree that to the extent that the classification impacts, as it clearly does, same-sex couples, that that classification can be viewed as being one of sexual orientation. Outside of the marriage context, Can you think of any other rational basis, reason, for a state using sexual orientation as a factor in denying homosexuals benefits or imposing burdens on them? Is there any other rational decision-making that the government could make denying them a job, not granting them benefits of some sort, any other decision? Your Honor, I cannot. I do not have anything to offer you in that regard. If that is true, then why aren't they a class? If they're a class that makes any other discrimination improper, irrational, then why aren't we treating them as a class for this one thing? Are you saying that the interest of marriage is so much more compelling than any other interests the state could have? No, Your Honor, certainly not. We are saying the interest in marriage and the state-centered society's interest in what we have framed as responsible procreation is vital. But at bottom, with respect to those interests, our submission is that same-sex couples and opposite-sex couples are simply not similarly situated. But to come back to your precise question, I think, Justice Sotomayor, you're probing into whether or not sexual orientation ought to be viewed as a quasi-suspect or suspect class. And our position is that it does not qualify under this Court's standard and traditional test for identifying suspectedness. The class itself is quite amorphous. It defies consistent definition, as the plaintiffs' own experts were quite vivid on. It does not qualify as an accident of birth, immutability in that sense. So I don't quite understand it. If you're not dealing with this as a class question, then why would you say that the government is not free to discriminate against women? Well, Your Honor, I think it's a very different question whether or not the government can proceed arbitrarily and irrationally with respect to any group of people, regardless of whether or not they qualify under this Court's traditional test for suspectiveness. And the hypothetical I understood you to be offering, I would submit, would create, unless there's something that is not occurring to me immediately, an arbitrary and capricious distinction among similarly situated individuals. That is not what we think is at the root of the traditional definition of marriage. Mr. Cooper, could I just understand your argument? In reading the briefs, it seems as though your principal argument is that same-sex and opposite-sex couples are not similarly situated because opposite-sex couples can procreate, same-sex couples cannot. And the State's principal interest in marriage is in regulating procreation. Is that basically correct? Your Honor, that's the essential thrust of our position, yes. So you have sort of a reason for not including same-sex couples. Is there any reason that you have for excluding them? In other words, you're saying, well, if we allow same-sex couples to marry, it doesn't serve the State's interest. But do you go further and say that it harms any State interest? Your Honor, we go further in the sense that it is reasonable to be very concerned that redefining marriage as a genderless institution could well lead over time to harms to that institution and to the interest that society has always used that institution to address. Your Honor, explain that a little bit to me, just because I did not pick this up in your briefs. What harm you see happening and when and how and what harm to the institution of marriage or to opposite-sex couples? How does this cause and effect work? Once again, I would reiterate that we don't believe that's the correct legal question before the Court and that the correct question is whether or not redefining marriage to include same-sex couples would advance the interests of marriage as it were. Well, then are you conceding the point that there is no harm or denigration to traditional opposite-sex marriage couples? So you're conceding that? No, Your Honor. No, I'm not conceding that. Then it seems to me that you should have to address Justice Kagan's question. Thank you, Justice Kennedy. I have two points to make on that. The first one is this. The plaintiff's expert acknowledged that redefining marriage will have real-world consequences and that it is impossible for anyone to foresee the future accurately enough to know exactly what those real-world consequences would be. And among those real-world consequences, Your Honor, we would suggest are adverse consequences. But consider the California voter in 2008 in the ballot booth with the question before her whether or not this age-old bedrock social institution should be fundamentally redefined and knowing that there's no way that she or anyone else could possibly know what the long-term implications of a profound redefinition of a bedrock social institution would be. That is reason enough, Your Honor. That would hardly be irrational for that voter to say. I believe that this experiment, which is now only fairly four years old, even in Massachusetts, the oldest state that is conducting it, to say, I think it's better for California to hit the pause button and await additional information from the jurisdictions where this experiment is still maturing. Mr. Cooper, let me give you one concrete thing. I don't know why you don't mention some concrete things. If you redefine marriage to include same-sex couples, you must permit adoption by same-sex couples. And there's considerable disagreement among sociologists as to what the consequences of raising a child in a single-sex family, whether that is harmful to the child or not. Some states do not permit adoption by same-sex couples for that reason. I don't think we know the answer to that. Do you know the answer to that, whether it harms or helps the child? No, Your Honor. But that's a possible deleterious effect, isn't it? Your Honor, it is certainly among the— It wouldn't be in California, Mr. Cooper, because that's not an issue, is it? In California, you can have same-sex couples adopting a child. That's right, Your Honor. That is true. But, Your Honor, here's the point. It's true but irrelevant. They're arguing for a nationwide rule, which applies to states other than California, that every state must allow marriage by same-sex couples. And so even those states that believe it is harmful—and I take no position on whether it's harmful or not, but it is certainly true that there's no scientific answer to that question at this point in time. And that, Your Honor, is the point I am trying to make. And it is the Respondent's responsibility to prove under rational basis reviewed not only that there clearly will be no harm, but that it's beyond debate that there will be no harm. You are opposing a judgment that applies to California only, not to all of the states. That's true, Your Honor. And if there were a way to cabin the arguments that are being presented to you to California, then the concerns about redefining marriage in California could be confined to California, but they cannot, Your Honor. I think there's substantial—there's substance to the point that sociological information is new. We have five years of information to weigh against 2,000 years of history or more. On the other hand, there is an immediate legal injury or legal—what could be a legal injury, and that's the voice of these children. There are some 40,000 children in California, according to the Red Brief, that live with same-sex parents. And they want their parents to have full recognition and full status. The voice of those children is important in this case, don't you think? Your Honor, I certainly would not dispute the importance of that consideration, that consideration especially in the political process where this issue is being debated and will continue to be debated. Certainly in California, it's being debated elsewhere. But on that specific question, Your Honor, there simply is no data. In fact, their expert agreed there is no data, no study even, that would examine whether or not there is any incremental beneficial effect from marriage over and above the domestic partnership laws that were enacted by the State of California to recognize, support, and honor same-sex marriage. Same-sex relationships and their families. There's simply no data at all that would permit one to draw that conclusion. I would recall, Justice Kennedy, the point made in Romer, that under rational basis review, a provision will be sustained even if it operates to the disadvantage of a group if it otherwise advances rationally a legitimate state interest. Mr. Cooper, we'll afford you more time. You shouldn't worry about losing your rebuttal time. Please continue on. As long as you're on that, then, I'd like to ask you this. Assume you could distinguish California. Suppose we accept your argument or accept the Scalia's version of your argument, and that distinguishes California. Now, let's look at California. What precisely is the way in which allowing gay couples to marry would interfere with the vision of marriage as procreation of children that allowing sterile couples of different sexes to marry would not? I mean, there are lots of people who get married who can't have children. And so take a state that does allow adoption and say, there, what's the justification for saying no gay marriage? Certainly not the one you said, is it? Am I not clear? You said that the problem is marriage as an institution that furthers procreation. Yes, Your Honor. And the reason there was adoption. But that doesn't apply to California. So imagine I wall off California and I'm looking just there where you say that doesn't apply. Now, what happens to your argument about the institution of marriage as a tool towards procreation, given the fact that in California, too, couples that aren't gay but can't have children get married all the time? Yes, Your Honor. The concern is that redefining marriage as a genderless institution will sever its abiding connection to its historic, traditional procreative purposes. And it will refocus the purpose of marriage and the definition of marriage away from the raising of children and to the emotional needs and desires of adults, of adult couples. Suppose a state said, Mr. Cooper, suppose a state said, because we think that the focus of marriage really should be on procreation, we're not going to give marriage licenses anymore to any couple where both people are over the age of 55. Would that be constitutional? No, Your Honor. It would not be constitutional. Because that's the same state interest, I would think. You know, if you're over the age of 55, you don't help us serve the government's interest in regulating procreation through marriage. So why is that different? Your Honor, even with respect to couples over the age of 55, it is very rare that both parties to the couple are infertile. No, really, because if a couple, I can just assure you, if both the woman and the man are over the age of 55, there are not a lot of children coming out of that marriage. Your Honor, society's interest in responsible procreation isn't just with respect to the procreative capacities of the couple itself. The marital norm, which imposes the obligations of fidelity and monogamy, Your Honor, advances the interest in responsible procreation by making it more likely that neither party, including the fertile party, to that death. I suppose we could have a questionnaire at the marriage desk when people come in to get their marriage. You know, are you fertile or are you not fertile? I suspect this Court would hold that to be an unconstitutional invasion of privacy. I just asked about age. I didn't ask about anything else. We ask about people's age all the time. Your Honor, and even asking about age, you would have to ask if both parties are infertile. Strom Thurmond was not the chairman of the Senate committee when Justice Kagan was confirmed. Very few men outlive their own fertility. A couple where both people are over the age of 55. A couple where both people are over the age of 55. And, Your Honor, again, the marital norm, which imposes upon that couple the obligation of fidelity, is designed, Your Honor, to make it less likely that either party to that marriage, will engage in irresponsible, procreative conduct outside of that marriage. Outside of that marriage. That's the marital norm, and so society has an interest in seeing a 55-year-old couple, just as it has an interest in seeing any heterosexual couple that intends to engage in a prolonged period of cohabitation, to reserve that until they have made a marital commitment. A marital commitment, so that should that union produce any offspring, it will be more likely that that child or children will be raised by the mother and father who brought them into the world. It's because we said that somebody who's locked up in prison and is not going to get out has a right to marry, has a fundamental right to marry. No possibility of procreation. Your Honor is referring, I'm sure, to the Turner case, and I think that, with due respect, Justice Ginsburg, way overreads Turner against Safley. That was a case in which the prison at issue, and it was decided in the specific context of a particular prison, where there were both female and male inmates, many of them minimum security inmates. It was dealing with a regulation, Your Honor, that had previously permitted marriage in the case of pregnancy and childbirth. The court here emphasized that among the incidents of marriage that are not destroyed by that, at least that prison context, was the expectation of eventual consummation of the marriage and legitimation of children. Thank you, Mr. Cooper. Thank you, Mr. Chief Justice. Mr. Olson. Thank you, Mr. Chief Justice, and may it please the Court. I know that you will want me to spend a moment or two addressing the standing question, but before I do that, I thought that it would be important for this Court to have Proposition 8 put in context what it does. It walls off gay and lesbians from marriage, the most important relation in life, according to this Court, thus stigmatizing a class of Californians based upon their status and labeling their most cherished relationships as second-rate, different, unequal, and not okay. Mr. Olson, I cut off your friend before he could get into the merits. I was trying to avoid that, Your Honor. I think it's only fair to treat you the same. Perhaps you could address your jurisdictional argument. Yes, I think that our jurisdictional argument is, as we set forth in the brief, California cannot create Article III standing by designating whoever it wants to defend the State of California in connection with the Fallot Act. This is not whoever it wants. These are five proponents of the measure, and if we were to accept your argument, it would give the State a one-way ratchet. The State could go in and make a defense, maybe a half-hearted defense of the statute, and then when the statute is held invalid, simply leave. On the other hand, if the State loses, the State can appeal. So this is a one-way ratchet that favors the State and allows governors and other constitutional officers in different states to thwart the initiative process. That's the way the California Supreme Court saw it with respect to California law. The governor and the attorney general of California are elected to act in the best interest of the State of California. They made a professional judgment, given their obligations as officers of the State of California. The California Supreme Court has said that proponents — and by the way, only four of the five are here. Dr. Cam withdrew from the case because of some — many things he said during the election campaign. Well, Mr. Olson, is it your position that the only people who could defend a ballot, a law that's adopted in California through the ballot initiative, are the attorney general and the governor? So that if the attorney general and the governor don't like the ballot initiative, it will go undefended? I don't think it's quite that limited. I think one of your colleagues suggested that there could be an officer appointed, there could be an appointee of the State of California who had responsibility, fiduciary responsibility, to the State of California and the citizens of California to represent the State of California. Who would appoint him? The same governor that didn't want to defend the policy? Well, that happens all the time, as you recall, in the case of — well, let's not spend too much time on independent counsel provisions. But the governor — the government of the State of California frequently appoints an attorney where there's a perceived conflict of interest. That person would have responsibility to the State and might have responsibility for the attorney's fees. I suppose there might be people out there with their own personal standing, someone who performs marriages and would like that to remain open to everyone but would prefer not to perform same-sex marriages, or other people. We seem to be addressing the case as if the only options are the proponents here or the State. I'm not sure there aren't other people out there with individual personalized injury that would satisfy Article 3. There might well be in a different case. I don't know about this case. If there was, for example — this was an initiative measure that allocated certain resources of the State of California and the people — maybe it was a binary system of people got resources and other people didn't get resources. There could be standing. Someone would show actual injury. The point, I guess, at the bottom of this is the Supreme — this Court decided in Raines v. Byrd that Congress couldn't specify members of Congress in that context, even where the measure depleted or diminished powers of Congress. The States are not bound by the same separation of powers doctrine that underlies the federal Constitution. You couldn't have a federal initiative, for example. They're free of all that. So start from the proposition that a State has standing to defend the constitutionality of a State law beyond dispute. The question then is who represents the State? Now, in a State that has initiative, the whole process would be defeated if the only people who could defend the statute are the elected public officials. The whole point — you know this better than I do because you're from California — the whole point of the initiative process was to allow the people to circumvent public officials about whom they were suspicious. So if you reject that proposition, what is left is the proposition that the State law can choose some other person, some other group, to defend the constitutionality of a State law. And the California Supreme Court has told us that the plaintiffs in this case are precisely those people. So how do you get around that? That's exactly what the California Supreme Court thought. The California Supreme Court thought that it could decide that the proponents, whoever they were — and this could be 25 years after the election. It could be one of the proponents. It could be four of the proponents. They could have an interest other than the State because they have no fiduciary responsibility to the State. They may be incurring attorney's fees on behalf of the State or on behalf of themselves, but they haven't been appointed. They have no official responsibility to the State. And my only argument — and I know it's a close one because California thinks that this is the system. The California Supreme Court thought this was a system that would be a default system. I'm suggesting from your decisions with respect to Article III that that takes more than that under — Mr. Olson, I think that you're not answering the fundamental fear. And the amici brief that sets forth this test of fiduciary duty doesn't quite either. The assumption is that there are not executive officials who want to defend the law. They don't like it. No one's going to do that. So how do you get the law defended in that situation? I don't have an answer to that question unless there's an appointment process either built into the system where it's an officer of — So why isn't this viewed as an appointment process, that the valid initiators have now become that body? And that's the argument — That's your argument. That's the argument our opponents make. But it must be said that it happens all of the time that Federal officials and State officials decide not to enforce a statute, to enforce a statute in certain ways. We don't then come in and decide that there's someone else ought to be in court for every particular — Well, Andy, what the brief says is that you first need to appoint people. It's not just that you appoint them. It's that the State's interest, when it defends a law, is the interest in executing the law of the State. So all you have to do is give a person that interest. But when a person has the interest of defending this law as opposed to defending the law of the State of California, there can be all kinds of conflicts, all kinds of situations. That's what I got out of the brief. So give the person that interest. And that, they say, is what's missing here. And you'll say — I mean, that's here. And you say it's missing here. Why is it missing here? It is what is missing here because you're not an officer of the State of California. You don't have a fiduciary duty to the State of California. You're not bound by the ethical standards of an officer of the State of California to represent the State of California. You could have conflicts of interest. And as I said, you could be incurring enormous legal fees on behalf of the State when the State hasn't decided to go that route. You should feel free to move on to the merits. Thank you, Your Honor. As I pointed out at the outset, this is a measure that walls off the institution of marriage, which is not society's right. It's an individual right that this Court again and again and again has said the right to get married, the right to have the relationship of marriage is a personal right. It's a part of the right of privacy, association, liberty, and the pursuit of happiness. In the cases in which you've described the right to get married under the Constitution, you've described it as marriage, procreation, family, other things like that. So the procreation aspect, the responsibility or ability or interest in procreation is not a part of the right to get married. I'm not sure, counsel, that it makes — I'm not sure that it's right to view this as excluding a particular group. When the institution of marriage developed historically, people didn't get around and say, let's have this institution, but let's keep out homosexuals. The institution developed to serve purposes that by their nature didn't include homosexual couples. It is — yes, you can say that it serves some of the other interests where it makes sense to include them, but not all the interests. And it seems to me, if your friend argues on the other side, if you have an institution that pursues additional interests, you don't have to include everybody just because some other aspects of it can be applied to them. Well, there's a couple of answers to that, it seems to me, Mr. Chief Justice. In this case, that decision to exclude gays and lesbians was made by the state of California. Oh, that's only because Proposition 8 came 140 days after the California Supreme Court issued it. That's right. And don't you think it's more reasonable to view it as a change by the California Supreme Court of this institution that's been around since time immemorial? The California Supreme Court, like this Supreme Court, decides what the law is. The California Supreme Court decided that the equal protection and due process clauses of that California Constitution did not permit excluding gays and lesbians from the right to get married. It led me right into a question I was going to ask. The California Supreme Court decides what the law is. That's what we decide, right? We don't prescribe law for the future. We decide what the law is. I'm curious, when did it become unconstitutional to exclude homosexual couples from marriage? 1791? 1868, when the 14th Amendment was adopted? Sometime after Baker, where we said it didn't even raise a substantial federal question? When did the law become this? I may answer this in the form of a rhetorical question. When did it become unconstitutional to prohibit interracial marriages? When did it become unconstitutional to assign children to separate marriages? Easy question. I think for that one, at the time that the equal protection clause was adopted. That's absolutely true. But don't give me a question for my question. When do you think it became unconstitutional? Has it always been unconstitutional? When the California Supreme Court faced the decision, which it had never faced before, does excluding gay and lesbian citizens who are a class based upon their status as homosexuals, is it constitutional? That's not when it became unconstitutional. That's when they acted in an unconstitutional manner. In an unconstitutional manner. When did it become unconstitutional to prohibit gays from marrying? They did not assign a date to it, Justice Scalia, as you know. But the court decided it was a case that came to court. I'm not talking about the California Supreme Court. I'm talking about your argument. You say it is now unconstitutional. Yes. Was it always unconstitutional? It was constitutional when we, as a culture, determined that sexual orientation is a characteristic of individuals that they cannot control. I see. When did that happen? There's no specific date in time. How am I supposed to know how to decide a case? Because the case that's before you today, California decided, the citizens of California decided, after the California Supreme Court decided that individuals had a right to get married, irrespective of their sexual orientation, in California, and then the Californians decided in Proposition 8, wait a minute, we don't want those people to be able to get married. So your case would be different if Proposition 8 was enacted into law prior to the California Supreme Court decision? That distinguishes it in one respect. But I would also make the argument, Mr. Chief Justice, that if marriage is a fundamental right and we're making a classification based upon a status of individuals, which this Court has repeatedly decided that gays and lesbians are defined by their status, there's no question about it. So it would be unconstitutional even in states that did not allow civil rights? We submit that? You could write a narrower? I want to know how long it has been unconstitutional. I don't know. When? It seems to me, Justice Scalia, that litigants... It seems to me you ought to be able to tell me when. Litigants... Because I don't know how to decide the case. I submit you've never required that before. When you decided that individuals, after having decided that separate but equal schools were permissible, a decision by this Court, when you decided that that was unconstitutional, when did that become unconstitutional? Fifty years ago it was okay? I can't answer that question, and I don't think this Court has ever answered that question. I can't either. That's the problem. I tell you now, the case that's before you today is whether or not California can take a class of individuals based upon their characteristics, their distinguishing characteristics, remove from them the right of privacy, liberty, association, spirituality, and identity that marriage gives them. It is not an answer to say procreation or anything of that nature, because procreation is not a part of the right to get married. That's a broad argument that's in this case, if the Court wants to reach it. The rationale of the Ninth Circuit was much more narrow. It basically said that California, which has been more generous, more open to protecting same-sex couples than almost any state in the Union, just didn't go far enough and is being penalized for not going far enough. That's a very odd rationale on which to sustain this. This Court has always looked at the context. For example, in the New Orleans case involving the gambling casinos and advertising, you look at the context of what was permitted, what was not permitted, and does that rationalization for prohibiting, in that case the advertising, in this case prohibiting the relationship of marriage, does it make any sense in the context of what exists? Well, seriously, Mr. Olson, if California provides all the substantive benefits of marriage to same-sex domestic partnerships, are you seriously arguing that if California, if the case before us now were from a state that doesn't provide any of those benefits to same-sex couples, this case would come out differently? No, I don't think it would come out differently because of the fundamental arguments we're making with respect to class-based distinctions, with respect to a fundamental right. However, to the extent that my opponent, in the context of California, talks about child-rearing or adoptions or rights of people to live together and that sort of thing, those arguments can't be made on behalf of California because California's already made a decision that gay and lesbian individuals are perfectly suitable as parents, they're perfectly suitable to adopt, they're raising 37,000 children in California, and the expert on the other side specifically said and testified that they would be better off when their parents were allowed to get married. I don't think you can have it both ways. Either this case is the same, this would be the same if this were Utah or Oklahoma, or it's different because it's California and California has provided all of these substances. I think that it's not that we're arguing that those are inconsistent. If the fundamental thing is that denying gays and lesbians the right of marriage, which is fundamental under your decisions, that is unconstitutional. If the state comes forth with certain arguments, Utah might come forth with certain justifications, California might come forth with others, but the fact is that California can't make the arguments about adoption or child-rearing or people living together because they've already made policy decisions, so that doesn't make them— So it's just about the label in this case. The label is— Same-sex couples have every other right, it's just about the label. The label marriage means something, even our opponents— If you tell a child that somebody has to be their friend, I suppose you can force the child to say, this is my friend, but it changes the definition of what it means to be a friend. And that's, it seems to me, what the supporters of Proposition 8 are saying here. All you're interested in is the label, and you insist on changing the definition of the label. It is like you were to say you can vote, you can travel, but you may not be a citizen. There are certain labels in this country that are very, very critical. You could have said in the Loving case, you can't get married, but you can have an interracial union. Everyone would know that that was wrong. The marriage has a status, recognition, support, and you read the— How do we know that that's the reason, or a necessary part of the reason, that we've recognized marriage as a fundamental right? You've emphasized that, and you've said, well, it's because of the emotional commitment. Maybe it is the procreative aspect that makes it a fundamental right. But you have said that marriage is a fundamental right with respect to procreation, and at the same level, getting married, privacy, you said that in the Zablocki case, you said that in the Lawrence case, and you said it in other cases. The Skinner case, for example, marriage is put on an equal footing with the procreational aspects, and this Court is the one that has said over and over again that marriage means something to the individual, the privacy, intimacy, and it is a matter of status and recognition. Mr. Olson, the bottom line that you're being asked, and this is one that I'm interested in the answer. If you say that marriage is a fundamental right, what state restrictions could ever exist? Meaning, what state restrictions with respect to the number of people, with respect to that could get married, the incest laws, the mother and child, assuming that they're the age, I can accept that the state has probably an overbearing interest on protecting a child until they're of age to marry. But what's left? Well, you've said in cases decided by this Court that the polygamy issue, multiple marriages raises questions about exploitation, abuse, patriarchy, issues with respect to taxes, inheritance, child custody. It is an entirely different thing. And if a state prohibits polygamy, it's prohibiting conduct. If it prohibits gay and lesbian citizens from getting married, it is prohibiting their exercise of a right based upon their status. It's selecting them as a class, as you described in the Romer case and as you described in the Lawrence case and in other cases. You're picking out a group of individuals to deny them the freedom that you've said is fundamental, important, and vital in this society, and it has status and stature, as you pointed out in the BMI case. Is there any way to decide this case in a principled manner that is limited to California? Yes. The Ninth Circuit did that. You could decide a standing case that limits it to the decision of the district court here. You could decide it as the Ninth Circuit did. The problem with the case is that you're really asking, particularly because of the sociological evidence in sight, for us to go into uncharted waters, and you can play with that metaphor. There's a wonderful destination, or there's a cliff, whatever the metaphor is. But you're doing so in a case where the opinion is very narrow, basically that once the state goes halfway, it has to go all the way or 70% of the way. And you're doing so in a case where there's a substantial question on standing. I just wonder if the case was properly granted. Oh, the case was certainly properly granted, Your Honor. I mean, there was a full trial of all of these issues. There was a 12-day trial. The judge insisted on evidence on all of these questions. But that's not the issue the Ninth Circuit decided. Yes, the Ninth Circuit looked at it and decided because of your decision on the Romer case, of this Court's decision on the Romer case, that it could be decided on the narrower issue, but it certainly was an appropriate case to grant. And those issues that I've been describing are certainly fundamental to the case. And I don't want to abuse the Court's indulgence. You suggested that this is uncharted waters. It was uncharted waters when this Court, in 1967, in the Loving decision, said that prohibitions on interracial marriages, which still existed in 16 states, were unconstitutional. It was hundreds of years old in the common law countries. This was new to the United States. And what we have here is— So that's not accurate. I respectfully submit that we've learned to understand more about sexual orientation and what it means to individuals. I guess the language that Justice Ginsburg used at the closing of the VMI case is an important thing. It resonates with me. A prime part of the history of our Constitution is the story of the extension of constitutional rights to people once ignored or excluded. Thank you, counsel. General O'Rilly? Mr. Chief Justice, and may it please the Court, Proposition 8 denies gay and lesbian persons the equal protection of the laws. You don't think you're going to get away with not starting with the jurisdiction? That was an amicus I thought I might, actually, Your Honor. And, of course, we didn't take a position on standing. We didn't brief it. We don't have a formal position on standing. But I will offer this observation based on the discussion today and the briefing. We do think that, while it's certainly not free of doubt, that the better argument is that there is not Article III standing here because I don't want to go beyond just summarizing our position because we don't have a formal position. But we do think that, with respect to standing, that at this point with the initiative process over, that Petitioners really have what is more in the nature of a generalized grievance. And because they're not an agent of the State of California, don't have any other official tie to the State that would result in any official control of their litigation, that the better conclusion is that there is not Article III standing here. Well, tomorrow you're going to be making a standing argument that some parties think is rather tenuous. But today you're very strong for Article III standing. Well, we said this was a close question. And our interests are, Justice Alito, in tomorrow's issues where we have briefed the matter thoroughly and will be prepared to discuss it with the Court tomorrow. With respect to the merits, two fundamental points lead to the conclusion that there's an equal protection violation here. First, every warning flag that warrants exacting scrutiny is present in this case. And Petitioners' defense of Proposition 8 requires the Court to ignore those warning flags and instead apply highly deferential, lee-optical, rational basis review, as though Proposition 8 were on a par with the law treating opticians less favorably than optometrists, when it really is the polar opposite of such a law. Senator Verrilli, I could understand your argument if you were talking about the entire United States. But your brief says it's only eight or nine states. The states that permit civil unions. And that brings up the question that was asked before. So a state that has made considerable progress has to go all the way. But, at least the Governor's position is, if the state has done absolutely nothing at all, then it can do as it will. That gets to my second point, Your Honor, which is that I do think the problem here with the arguments that Petitioners are advancing is that California's own laws do cut the legs out from under all of the justifications that Petitioners have offered in defense of Proposition 8. And I understand Your Honor's point and the point that Justice Kennedy raised earlier, but I do think this Court's equal protection jurisprudence requires the Court to evaluate the interest that the state puts forward, not in a vacuum, but in the context of the actual substance of California law. And here, with respect to California law, gay and lesbian couples do have the legal rights and benefits of marriage, full equality in adoption, full access to assisted reproduction. And therefore, the argument about the state's interest that Petitioners advance have to be tested against that reality, and they just don't measure up to none of that. Well, what is the one? Look, a state that does nothing for gay couples hurts them much more than a state that does something. And, of course, it's true that it does hurt their argument that they do quite a lot, but which are their good arguments, in your opinion? I mean, take a state that really does nothing whatsoever. They have no benefits, no nothing, no nothing. Okay? And, moreover, if you're right, even in California, if they're right or, you know, if a pact is enough, they won't get federal benefits, those that are tied to marriage, because they're not married. So a state that does nothing hurts them much more, and yet your brief seems to say it's more likely to be justified under the Constitution. I'd like to know with some specificity how that could be. Well, because you have to measure under the standard of equal protection scrutiny that we think this Court's case is quite fair. I know the principle, but I'm saying which are their good arguments, in your opinion, that would be good enough to overcome the state that does nothing, but not good enough to overcome California, where they do a lot? Well, what we're saying about that is that we're not prepared to close the door to an argument in another state where the state's interests haven't cut the legs out from under the arguments. And I think, I suppose, the caution rationale that Mr. Cooper identified with respect to the effects on children, if it came up in a different case with a different record, after all, here, this case was litigated by Petitioners on the theory that rational basis applied and they didn't need to show anything. And so they didn't try to show anything. Our view is that heightened scrutiny should apply, and so I don't want to kid about this. We understand that would be a very heavy burden for a state to meet. All we're suggesting is that in a situation in which the state interests aren't cut out from under it, as they are here, that that issue ought to remain open for a future case. And I think the caution rationale would be the one place where you might leave it open. But you can't leave it open in this case. General, there is an irony in that, which is the states that do more have less rights? Well, I understand that, Your Honor, but I do think that you have to think about the claim of right on the other side of the equation here. And in this situation, the argument here that gay and lesbian couples can be denied access to marriage on the ground of an interest in responsible procreation and child rearing just can't stand up, given that the parents have full equality, the gay and lesbian parents have full equality apart from. Do you want us to test the effects of same-sex marriage, the potential effects of same-sex marriage, the potential effects of Proposition 8? But what is your response to the argument, which has already been mentioned, about the need to be cautious in light of the newness of the concept of same-sex marriage? The one thing that the parties in this case seem to agree on is that marriage is very important. It's thought to be a fundamental building block of society, and it's preservation essential for the preservation of society. Traditional marriage has been around for thousands of years. Same-sex marriage is very new. I think it was first adopted in the Netherlands in 2000. So there isn't a lot of data about its effect, and it may turn out to be a good thing. It may turn out not to be a good thing, as the supporters of Proposition 8 apparently believe. But do you want us to step in and render a decision based on an assessment of the effects of this institution, which is newer than cell phones or the Internet? We do not have the ability to see the future. On a question like that, of such fundamental importance, why should it not be left for the people, either acting through initiatives and referendums or through their elected public officials? I have four points I'd like to make in response to that, Justice Alito. I think they're all important. First, California did not, through Proposition 8, do what my friend Mr. Cooper said and push a pause button. They pushed a delete button. This is a permanent ban. It's in the Constitution. It's supposed to take this issue out from the legislative process. So that's the first point. Second— Well, just in response to that, of course the Constitution could be amended, and I think I read that the California Constitution has been amended 500 times. So it's not exactly like the U.S. Constitution. But it does change. Of course not. But the aim of this is to take it out of the normal legislative process. The second point is that with respect to the concerns that Your Honor has raised, California has been anything but cautious. It has given equal parenting rights, equal adoption rights. Those rights are on the books in California now, and so the interest of California is that Petitioners are articulating with respect to Proposition 8 has to be measured in that light. The rest of the country has been cautious. And that's why we're— And you're asking us to impose this on the whole country, not just California. No. Respectfully, Justice Scalia, we are not. Our position is narrower than that. Our position — the position we have taken is about States — applies to States that have, like California and perhaps other States, that have granted these rights short of marriage. I want you to get back to Justice Alito's other points. But is it the position of the United States that same-sex marriage is not required throughout the country? We're not — we are not taking the position that it is required throughout the country. We think that that ought to be left open for future adjudication in other States that don't have the situation California has. So your position is only if a State allows civil unions does it become unconstitutional to forbid same-sex marriage, right? I see my— Well, you can go on. Thank you. Our position is — I would just take out a red pen and take the word only out of that sentence. When that is true, then the Equal Protection Clause forbids the exclusion of same-sex marriage. And it's an open question otherwise. And if I could just get to the third reason, which I do think is quite significant, the argument here is about caution. It's an argument that, well, we need to wait. We understand that. We take it seriously. But waiting is not a neutral act. Waiting imposes real costs in the here and now. It denies to the parents who want to marry the ability to marry, and it denies to the children. Ironically, the very thing that Petitioners focus on is at the heart of the marriage relationship. But you're willing to wait in the rest of the country. You say it's got to happen right now in California, but you don't even have a position about whether it's required in the rest of the country. With respect to a state that allows gay couples to have children and to have families and then denies the stabilization— So it's got to happen right away in those states where same-sex couples have every legal right that married couples do. But you can wait in states where they have fewer legal rights. What I said is an open question with respect to those states, and the Court should wait and see what kind of a record a state could make. But in California, you can't make the record to justify the exclusion. And the fourth point I would make on this, recognizing that these situations are not— How would the record be different elsewhere? Well, they might try to make a different record about the effects on children. But there isn't a record to that effect here. And the fourth point I would make, and I do think this is significant, is that the principle argument in 1967 with respect to loving and that the Commonwealth of Virginia advanced was, well, the social science is still uncertain about how biracial children will fare in this world, and so you ought to apply rational basis scrutiny and wait. And I think the Court recognized that there's a cost to waiting and that that has got to be part of the equal protection calculus. And so I do think that's quite fundamental. Could I ask you a problem about — it seems to me that the position that you're supporting is somewhat internally inconsistent. We see the argument made that there's no problem with extending marriage to same-sex couples because children raised by same-sex couples are doing just fine and there's no evidence that they're being harmed. And the other argument is Proposition 8 harms children by not allowing same-sex couples to marriage. Well, which is it? Well, I think what Proposition 8 does is deny the long-term stabilizing effect that marriage brings. That's the argument for marriage. But you also tell me there's been no harm shown to children of same-sex couples. There are 37,000 children in same-sex families in California now. Their parents cannot marry. And that has effects on them in the here and now. The stabilizing effect is not there. When they go to school, they have to — you know, they don't have parents like everybody else's parents. That's a real effect, a real cost in — Well, a real cost right now would be you're asking me to write these words. A state that has a pact has to say marriage. All right. But I'm not telling you about states that don't. Well, I would guess there's a real-world effect there, too. The states that are considering pacts will all say we won't do it. Or not all, but some would. Right. And that would have a real effect right now. And at the moment, I'm thinking it's much more harmful to the gay couple, the latter, than the former. But you won't give me advice, as the government, on how to deal with that. Well, we think that, as I started my argument, Your Honor, that all the warning flags for exacting protection scrutiny are present here. This is a group that has suffered a history of terrible discrimination that petitioners don't deny. Petitioners said at the podium today that there is no justification for that discrimination in any realm other than the one posed in this case. And so when those two factors are present, those are paradigm considerations for the application of heightened scrutiny. And so I don't want to suggest that in states that haven't taken these steps, that states that haven't taken this step, that they're going to have an easy time meeting heightened scrutiny, which I think has to apply to all of those states. It would be a different case. Now, all I'm saying is that the door ought to remain open to that case, not that it would be easy for the state to prevail in that case. Thank you, General. Mr. Cooper, to keep things fair, I think you have 10 minutes. Thank you very much. And you might address why you think we should take and decide this case. Yes, Your Honor. And that is one thing on which I wholeheartedly agree with my friend, Mr. Olson. This case is now properly before the court, was properly granted, even if, Your Honor, one could defend the specific judgment below for the Ninth Circuit, a defense that I haven't heard offered to this court. A judicial redefinition of marriage, even if it could be limited to California, is well worthy of this Court's attention, particularly, Your Honor, as it comes from a single district court judge in a single jurisdiction. I would also like to — I think that begs your — Mr. Olson doesn't really focus on this. If the issue is letting the states experiment and letting the society have more time to figure out its direction, why is taking a case now the answer? Because, Your Honor — We let issues perk, and so we let racial segregation perk for 50 years. From 1898 to 1954. Your Honor, it is hard to — And now we're only talking about, at most, four years. It is hard to imagine a case that would be better, or more thoroughly, I should say at least, briefed and argued to this Court. It's too late for that now, isn't it? I mean, we grant it cert. I mean, that's essentially asking, you know, why did we grant cert? We should let it percolate for another — you know, we've crossed that river, I think. And in this particular case, to not grant certiorari is to essentially bless a judicial decision that, at least in the state of California, the people have no authority to step back, get the pause button, and allow the experiments that are taking place in this country to further mature. That, in fact, at least in California — and it's impossible to limit this ruling, Your Honor, even to California. Even the Solicitor General's argument, he says, applies to at least eight states. It's impossible to limit these propositions to any particular jurisdiction. So this Court would be making a very real decision with respect to same-sex marriage if it should simply decide to dismiss the writ as improvidently granted, Justice Kennedy. And let's just step back and just consider for a moment the Solicitor General's argument. He is basically submitting to the Court that essentially the one compromise that is not available to the states is the one that the state of California has undertaken, that is to go as far as the people possibly can in honoring and recognizing the families and the relationships of same-sex couples while still preserving the existence of traditional marriage as an institution. That's the one thing that's off the table. I thought he was saying, Mr. Cooper, it's not before the Court today. And remember, Loving v. Virginia was preceded by the McLaughlin case. So first there was the question of no marriage, and then there was marriage. So in that sense, I understood the Solicitor General to be telling us that case is not before the Court today. Forgive me, Justice Ginsburg. The case of what case is it before the Court? I think it was McLaughlin v. Florida. Yes. With cohabitation of people of different races. And the Court took that case and waited to reach the marriage case. Yes, Your Honor. Well, forgive me, Your Honor. I'm not sure I'm following the Court's question. My memory may be wrong, but I think the case was that people of different races were arrested and charged with the crime of interracial cohabitation. And the Court said that that was invalid. Yes. Yes, thank you, Your Honor. Forgive me. And I'm glad that counsel for the respondents mentioned the Loving case, because what this Court ultimately said was patently obvious, is that the colors of the skin of the spouses is irrelevant to any legitimate purpose, no more so than their hair colors, any legitimate purpose of marriage, that interracial couples and same-race couples are similarly situated in every respect with respect to any legitimate purpose of marriage. This question really boils down here. Whether or not it can be said that for every legitimate purpose of marriage are opposite-sex couples and same-sex couples indistinguishable. Indistinguishable. And with all due respect to counsel and to the respondents, that is not a hard question if, in fact, it is true, as the people of California believe that it still is true, that the natural procreative capacity of opposite-sex couples continues to pose vitally important benefits and risks to society. And that's why marriage itself is the institution that society has always used to regulate those heterosexual procreative relationships. Counsel, the Solicitor General has said that the ban that proposition erects in California is permanent. Well, certainly that is not the view of the respondents and what we read every day. This is not an issue that is now at rest in the state of California, regardless, well, unless this court essentially puts it to rest. That democratic debate, which is roiling throughout this country, will definitely be coming back to California. It is an agonizingly difficult for many people political question. We would submit to you that that question is properly decided by the people themselves. Thank you, Mr. Chief Justice. Thank you, counsel. Counsel, the case is submitted.